# Supreme Court of Louisiana

The Opinion handed down on the **1st day of June, 2026** is as follows:

**PER CURIAM:**

2026-CD-00594    GARY CROCKETT VS. STATE OF LOUISIANA; JEFF LANDRY, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF LOUISIANA, ET AL. C/W CHELSEY RICHARD NAPOLEON, IN HER OFFICIAL CAPACITY AS CLERK OF COURT FOR ORLEANS PARISH VS. CITY OF NEW ORLEANS; JEAN PAUL "J.P." MORRELL IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE NEW ORLEANS CITY COUNCIL; HELENA MORENO IN HER CAPACITY AS THE MAYOR OF THE CITY OF NEW ORLEANS & CALVIN JOHNSON, IN HIS CAPACITY AS CITY APPOINTED INTERIM CLERK OF COURT FOR ORLEANS PAIRSH (Parish of East Baton Rouge)

STAY LIFTED. WRIT GRANTED. REVERSED AND RENDERED. PERMANENT INJUNCTION IMPOSED. SEE PER CURIAM.

Weimer, C.J., dissents and assigns reasons.

Hughes, J., additionally concurs and assigns reasons.

Griffin, J., dissents and assigns reasons.

Guidry, J., dissents and assigns reasons.

Cole, J., additionally concurs for the reasons assigned by Justice Hughes.

No. 2026-CD-00594

GARY CROCKETT

VS.

STATE OF LOUISIANA; JEFF LANDRY, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF LOUISIANA, ET AL.

C/W

CHELSEY RICHARD NAPOLEON, IN HER OFFICIAL CAPACITY AS CLERK OF COURT FOR ORLEANS PARISH

VS.

CITY OF NEW ORLEANS; JEAN PAUL "J.P." MORRELL IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE NEW ORLEANS CITY COUNCIL; HELENA MORENO IN HER CAPACITY AS THE MAYOR OF THE CITY OF NEW ORLEANS & CALVIN JOHNSON, IN HIS CAPACITY AS CITY APPOINTED INTERIM CLERK OF COURT FOR ORLEANS PARISH

On Supervisory Writ to the 19th Judicial District Court,
Parish of East Baton Rouge

**PER CURIAM**

In these consolidated matters, we are called upon to determine the constitutionality of Act 15 of the 2026 Regular Session ("Act 15"). For the reasons that follow, we conclude Act 15 represents a valid exercise of legislative power.

**FACTS AND PROCEDURAL HISTORY**

Historically, Orleans Parish has been unique among all parishes in the state insofar as it has separate clerks of court for the Civil District Court and the Criminal District Court. The position of clerk of court for the Civil District Court is currently held by Chelsey Richard Napoleon, who was reelected on November 15, 2025, to a term commencing on May 4, 2026. An election for the position of clerk of Criminal District Court was also held on November 15, 2025, at which time the voters elected Calvin Duncan for a term which was set to begin on May 4, 2026.

On April 30, 2026, the governor signed Act 15 into law, and it became immediately effective. Section 4 of the Act (emphasis supplied) provides:

> Section 4. The provisions of this Act shall not reduce the current term of office of the clerk of criminal district court for the parish of Orleans on the effective date of this Act. ***The office of clerk of criminal district court for the parish of Orleans shall be abolished at the end of May 3, 2026, and before the term of any other criminal clerk of court begins***. ***Immediately thereafter, the authority, functions, duties, and responsibilities of the office*** of clerk of criminal district court for the parish of Orleans, and all of the books, papers, records, monies, actions, and other property of every kind and description, movable and immovable, real and personal, possessed, controlled, or used by the office of the clerk of criminal district court for the parish of Orleans ***shall be transferred and owned, possessed, controlled, and used by the clerk of the civil district court for the parish of Orleans, who shall thereafter be referred to as the clerk of court for the parish of Orleans***.

Following the enactment of Act 15, Gary Crockett, an Orleans Parish registered voter, filed a petition for declaratory judgment and requests for injunctive relief against the State of Louisiana ("State") and others in the 19th Judicial District Court ("*Crockett*"). Mr. Crockett alleged the office of criminal clerk can only be abolished through a constitutional amendment. On May 8, 2026, the district court issued an injunction prohibiting "any further physical consolidation of the Orleans Parish Clerk's offices into one pending further proceedings in this matter." Upon emergency application by the State, this Court issued an order on May 10, 2026, that stayed these proceedings pending further orders of this Court.

One day later, on May 11, 2026, the New Orleans City Council ("Council") declared a vacancy in the office of clerk of court for the parish of Orleans and appointed retired Judge Calvin Johnson as interim clerk of court. The Council also called for a special election pursuant to La. R.S. 18:602 to permanently fill the position that it contends is vacant.

Following the Council's action, Ms. Napoleon filed suit in the 19th Judicial District Court against the City of New Orleans and various city officials. Her petition alleged the City exceeded its constitutional and statutory authority by appointing an interim clerk of court and by ordering a special election ("*Napoleon*").

On May 14, 2026, this Court issued a special order assuming jurisdiction over both suits.  The order stayed all proceedings, except that we expressly permitted a previously scheduled May 18, 2026 hearing in *Napoleon* to proceed, subject to the condition that the district court, without ruling, immediately transfer the record of the hearing to this Court.  Additionally, this Court enjoined the ostensible interim clerk from executing any duties and enjoined all officials from interfering with the duties of Ms. Napoleon under Act 15 pending further orders of this Court.

## JURISDICTION

Considering the interests of judicial economy and the urgent need to provide a definitive resolution to prevent further confusion, it is necessary to exercise our plenary supervisory authority over both *Crockett* and *Napoleon* under La. Const. Art. V, § 5(a). The "[s]upervisory authority of this court is plenary, unfettered by jurisdictional requirements, and exercisable at the complete discretion of the court," whether or not lower courts have acted. *Marionneaux v. Hines*, 05-1191, p. 4 (La. 5/12/05), 902 So. 2d 373, 376. We have long recognized that the exercise of this authority is warranted when "the issues presented were of an extraordinary nature, time-sensitive, and of such significant public interest that the court's plenary, supervisory jurisdiction should be exercised." *State v. All Prop. & Cas. Ins. Carriers Authorized & Licensed To Do Bus. In State*, 2006-2030, p. 4 (La. 8/25/06), 937 So. 2d 313, 318. *See also* Special Order docketing this matter (C.J. Weimer *additionally concurring*, p.1, n. 1). Here, three different people claim the authority to act as clerk.

This case clearly meets that standard. *Id.* Having determined our jurisdiction is properly invoked, we now turn to the merits of this important matter.

**DISCUSSION**

**I. Does Act 15 of the 2026 Regular Session ("Act 15"), insofar as it abolishes the office of clerk of court for the Criminal District Court for the Parish of Orleans, violate any provision of the Constitutions of the United States or Louisiana?**

The primary arguments of the parties focus on the authority for Act 15 under the provisions of La. Const. Art. V, § 32, which provides:

> Except for provisions relating to terms of office as provided elsewhere in this Article, and ***notwithstanding any other contrary provision of this constitution***,[1] ***the following courts and officers in Orleans Parish are continued, subject to change by law***; the civil and criminal district courts; the city, municipal, traffic, and juvenile courts; ***the clerks of the civil and criminal district courts***; the civil and criminal sheriffs; the constables and the clerks of the first and second city courts; the register of conveyances; and the recorder of mortgages.

As noted, Orleans Parish has long maintained a different court structure from the rest of the state. In his book <u>The Louisiana State Constitution: A Reference Guide</u>, Professor Lee Hargrave explained that this unusual structure was discussed extensively during the Constitutional Convention of 1974. In particular, Professor Hargrave states, "[o]rganization of the Orleans courts was the single issue that occupied the most time in the Judiciary Committee and that provoked the most controversy." *Id.* at 91. "To placate Orleans interests, the committee did not urge [immediate] merger" of its unique offices or court structure.

The Convention instead allowed Orleans Parish to retain its anomalous structure with numerous extra offices and judges compared to the rest of the state but affirmatively rejected attempts to protect them into the future. *Id.* at 92 (stating "[t]he convention would not give such strong protection to the status quo," rejecting

---

[1] This clause makes clear the primacy of § 32 over other constitutional provisions like the published local notice provisions raised by intervenors. There is also an extensive history, through the passage of many hundreds of laws, supporting the longstanding view that all laws concerning the state's courts and judicial officers such as clerks, even if limited in scope, are matters of statewide importance and general concern. They are not local laws regardless of geographic remit.

Additionally, our jurisprudence has long held that "the publication required by La. Const. art. 3, § 13 (1974) is inapplicable, even though a law is local or special, if the constitution elsewhere grants the power to adopt legislation on a particular subject." *City of New Orleans v. Treen*, 431 So.2d 390, 395 (La. 1983).

attempts to require either a super-majority vote or local referenda before change). The "convention's action reflected *dissatisfaction with the nonuniform structure of Orleans courts*" and it voted "finally in favor of permitting change *simply by law, meaning the normal legislative majority vote*." *Id*. (emphasis supplied).

As shown by the discussions at the 1974 Constitutional Convention, myriad Orleans Parish judicial offices were retained in lieu of any immediate merger or reduction. However, La. Const. Art. V, § 32 made it clear that offices such as the "clerks of the civil and criminal district courts" were continued "subject to change by law."   In other words, the continued existence of these offices and courts was placed under the express and unconstrained control of the legislature.[2]

For those enumerated offices and courts, the remaining provisions of the Louisiana Constitution are expressly subservient to a plenary authority of the legislature to make changes by regular law adopted by a majority vote. In *Davenport v. Hardy*, 349 So. 2d 859 (La. 1977), when interpreting this same Section of the Constitution, this Court has held that "the Constitution generally establishes the Legislature's power to govern [office(s) under § 32]. *It imposes no limitations or restrictions on the exercise of that power, and it does not fix the terms of office*[.]" *Id.* at 863 (emphasis supplied). *See also State v. Francois,* 445 So. 2d 416, 418 (La. 1983) ("This section continues the former constitution's separation between the civil and criminal district courts in Orleans Parish. But it also reserves to the legislature the plenary lawmaking power to change this division by law. Accordingly, *the*

---

[2] Notably, La. Const. Art. V, § 32 sets forth an exception for "provisions relating to terms of office as provided elsewhere in this Article. . . ."  This is a reference to La. Const. Art. V, § 21 which provides that the "*term of office, retirement benefits, and compensation of a judge shall not be decreased* during the term for which he is elected." (emphasis added).  That is the only historically consistent reading. For example, La. Const. Art. V, § 15(C) provides for six-year terms for all trial judges, including city judges, but it is not universally applicable in Orleans Parish where the elected Municipal Judges still serve staggered eight-year terms.

In contrast to the protection expressly provided to judges during their terms of office, there is no comparable constitutional protection for the "term" related to the clerk's office that is applicable here. La. Const. Art. X, § 23 instead provides only that "[t]he *compensation* of an elected public official *shall not be reduced* during the term for which he is elected." (emphasis added).

***legislature may completely abolish, partially erase or otherwise change the separation between these courts by law***.") (emphasis supplied).

"When a constitutional provision is plain and unambiguous its language must be given effect." *LeBlanc v. Altobello*, 497 So. 2d 1373, 1374-75 (La. 1986). The clear and plain language of La. Const. Art. V, § 32 provides that the offices of clerk of the civil district court and clerk of the criminal district court are expressly subject to the provisions of that Section rather than the provisions of La. Const. Art. V, § 28 concerning clerks of court generally.

Similarly, the right to vote under La. Const. Art. I, §10 is undoubtedly sacrosanct, but it is a right granted to our voters, not a mechanism to preserve offices for their elected occupants. Our Constitution protects the terms of some elected officials expressly. *See, e.g.,* La. Const. Art. IV, § 20 and La. Const. Art. V, § 21. The Convention delegates considered a draft that added identical language to protect the terms of office for the officials in the Orleans specific section, but it ultimately rejected that proposal. Records of the Louisiana Constitutional Convention of 1973, volume I, p. 100. That rejected version also included a "notwithstanding" clause directed only at the constitutional provisions for clerks and sheriffs. Instead, the final version of La. Const. Art. V, § 32 provides the broad grant of legislative authority that is "notwithstanding" any contrary provision of the Constitution.[3]

Section 32 grants the legislature unfettered authority over those offices or any legislatively designated successor office.[4] It was free to add to the duties of the clerk

---

[3] Elected public officials do not have a federally constitutionally protected right to their offices, which exists only as a public trust. *See, e.g., Snowden v. Hughes,* 321 U.S. 1, 12, 64 S.Ct. 397, 88 L.Ed. 497 (1944) and *Taylor v. Beckham,* 178 U.S. 548, 577, 20 S.Ct. 890, 44 L.Ed. 1187 (1900). ***There is no federal right to elect a clerk of court or prevent the abolition of that office, and our state constitution similarly does not provide that protection for these particular offices***. The 'right to vote' under the Louisiana Constitution is a right given to our citizens, it does not provide a back door mechanism to obviate the Constitution's clear grant of authority to the legislature to control these specific offices. Anyone elected to these offices is elected subject to the provisions of § 32.

[4] The legislature was free to alter the duties or specify the manner of selection for offices under § 32, including creating an entirely new office still subject to the provisions of § 32.

of the civil district court or alter its nomenclature. The legislature also had full authority to abolish the office of clerk of the criminal district court.

Finally, we find no violation of the United States Constitution. The Supreme Court long recognized that nothing in the United States Constitution shields a state office from abolition by its own legislature. *See Fisk v. Police Jury of Jefferson*, 116 U.S. 131, 133, 6 S. Ct. 329, 330 (1885) (rejecting the proposition "that a person elected to an office for a definite term has any such contract with the government or with the appointing body as to prevent the legislature or other proper authority from abolishing the office, or diminishing its duration, or removing him from office").

## II. Does the enactment of Act 15 create a vacancy in any office requiring the May 11, 2026, actions by the City of New Orleans?

Respondents assert that even if Act 15 complies with the Constitution, its effect was to create a new office. They allege there is now a vacancy in this new office which requires an interim appointment followed by a special election.

The clear language of Act 15 unequivocally demonstrates it did not create a new office. To the contrary, Section 4 of the Act plainly provides "the authority, functions, duties, and responsibilities of the office of clerk of criminal district court for the parish of Orleans . . *shall be transferred*" to the "clerk of the civil district court for the parish of Orleans, who shall thereafter be *referred to as* the clerk of court for the parish of Orleans." (emphasis added).

The legislature was obviously aware the clerk of civil district court was reelected to a term beginning on May 4, 2026, and immediately prior to that date it abolished the office of criminal clerk. The effect of Act 15 was merely to expand the civil clerk's duties to include those duties formerly performed by the criminal clerk and to rename the office "clerk of court for the parish of Orleans." As discussed in the preceding section, this change was entirely within the authority of the legislature.

In reaching this conclusion, we acknowledge that the timing of the legislation was perhaps unfortunate. A policy argument can be made that the legislature should have acted prior to the fall election, or twenty years ago (when Act 621 of the 2006 Regular Session initially merged these offices before it was later reversed), or fifty years ago shortly after the convention delegates first raised concern about the Orleans judiciary. Nonetheless, it is not our place under our constitutional tripartite system to question the wisdom of the legislature in adopting this statute, or its timing. The people of Louisiana have vested these decisions in their elected representatives. It is our role only to determine Act 15's applicability, legality, and constitutionality. *Soloco, Inc. v. Dupree*, 97-1256, p. 16-17(La. 1/21/98), 707 So. 2d 12, 16.

## CONCLUSION

No provision of the Louisiana or United States Constitution prohibits Act 15 from being immediately effective. By the clear terms of the Act, there is no vacancy in any office. Accordingly, any relief granted by the trial court is vacated and this matter is dismissed.[5]

## DECREE

For the reasons assigned, the May 8, 2026 judgment of the district court granting a preliminary injunction against the consolidation of the clerks' offices is reversed and vacated. Judgment is rendered finding that Act 15 of the 2026 Regular Session is constitutional and effective as enacted. The injunction granted in our May 14, 2026 order enjoining the City from appointing an interim clerk or anyone from interfering with the implementation of Act 15 is made permanent. In all other

---

[5] Because we find that Chelsey Napoleon is the Orleans Clerk pursuant to Act 15 and there is no vacant office, Calvin Johnson is permanently enjoined from attempting to exercise any duties under the appointment of the New Orleans City Council. The City Defendants' call for a proposed special election conflicts with the law and is therefore also permanently enjoined.

Additionally, due to the obvious confusion surrounding the implementation of Act 15, we foreclose any implication that Chapter 3 of Title 42 of the Louisiana Revised Statutes of 1950, as amended, relating to the usurpation of office, should be found to have been violated here. Any actions taken prior to this Court rendering this judgment shall not be considered a violation of that Chapter.

respects, the stay of proceedings issued by this court on May 10, 2026 is hereby lifted. The motion for oral argument is hereby denied as moot.

Any rehearing from this judgment shall be filed no later than June 5, 2026.

**STAY LIFTED. WRIT GRANTED. REVERSED AND RENDERED. PERMANENT INJUNCTION IMPOSED.**

GARY CROCKETT

VS.

STATE OF LOUISIANA; JEFF LANDRY, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF LOUISIANA, ET AL.

C/W

CHELSEY RICHARD NAPOLEON, IN HER OFFICIAL CAPACITY AS CLERK OF COURT FOR ORLEANS PARISH

VS.

CITY OF NEW ORLEANS; JEAN PAUL "J.P." MORRELL IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE NEW ORLEANS CITY COUNCIL; HELENA MORENO IN HER CAPACITY AS THE MAYOR OF THE CITY OF NEW ORLEANS & CALVIN JOHNSON, IN HIS CAPACITY AS CITY APPOINTED INTERIM CLERK OF COURT FOR ORLEANS PARISH

*On Supervisory Writ to the 19th Judicial District Court,*
*Parish of East Baton Rouge*

**WEIMER, C.J.,** dissents and assigns reasons.

The action by the Legislature to abolish a public office before the person elected to that office can assume the duties of the office makes a mockery of the electoral process by completely obliterating the constitutional effectiveness of the people's vote. While the Legislature undeniably has the right to abolish the position of Clerk of Orleans Criminal District Court by way of La. Const. art. V, § 32, this must be done *prospectively* to avoid violating one of the most sacred and fundamental rights in our system of government—the people's right to choose who will serve in an elective office.

*"The right to vote is the right upon which all other rights depend."* **Thomas Paine**

*"Elections belong to the people. It's their decision."* **Abraham Lincoln**

*"Nobody will ever deprive the American people of the right to vote except the American people themselves, and the only way they could do this is by not voting."* **Franklin D. Roosevelt**

*"The right to vote is the crown jewel of American liberties, and we will not see its luster diminished."* **Ronald Reagan**

*"The right to vote 'is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government.'"* **Richardson v. Ramirez**, 418 U.S. 24, 77; 94 S.Ct. 2665, 2682 (1974) (Marshall, J., dissenting), (quoting **Reynolds v. Sims**, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378 (1964) (Warren, C.J.))

*"... [G]overnment of the people, by the people, for the people, shall not perish from the earth."* **Abraham Lincoln**, Gettysburg Address, November 19, 1863.

*"Someone struggled for your right to vote. Use it."* **Susan B. Anthony**

*"My vote is my voice ... and the voice of all who struggled, so that I may have my voice."* **Lydia Obasi**

*"Voting is the foundation stone of political action."* **Rev. Martin Luther King, Jr.**

*"The vote is precious. It is almost sacred. It is the most powerful nonviolent tool we have in democracy."* **Congressman John Lewis**

*"The most important political office is that of the private citizen."* **Justice Louis Brandeis**

*"Democracy is based upon the conviction that there are extraordinary possibilities in ordinary people."* **Harry Emerson Fosdick**

I begin my dissent with these quotes from a diverse group of individuals, one who spoke before this nation was founded and others as this nation's history unfolded, since the right to vote—and to have one's vote counted—is at stake in this case. If the Legislature can deprive a duly elected office holder of the opportunity to take office, then the Legislature is also depriving citizens of the efficacy of their votes. Such a process effectively eviscerates the electoral process, negates the right to vote, and discourages citizen participation in the electoral process.

The right of qualified citizens of Louisiana to vote and to have their votes counted, inherent in our republican form of government and the democratic process, is a fundamental and constitutionally protected right. **Adkins v. Huckabay**, 99-3605, p. 7 (La. 2/25/00), 755 So.2d 206, 211. To fulfill this right, the Louisiana Constitution instructs the Legislature to "adopt an election code which shall provide for permanent registration of voters and for the conduct of all elections" and to "provide a method for absentee voting." La. Const. art. XI, §§ 1, 2. The constitutional grant of the right to vote along with a direction to establish a code including the rules, procedures, and methods to exercise that right evidences an intent that the Legislature has broad powers to legislate the conduct, the when, the where, and the how of the election process. **Adkins**, 99-3605 at 7, 755 So.2d at 211.

However, despite those broad powers, if the Legislature is able to enact a statute that bypasses those rules, procedures, and methods after the election of a person to public office, then our constitutional grant of the right to vote is negated. The right to vote not only allows citizens to cast their ballots, but also to have their votes counted and have meaning and effect. The right to vote becomes a hollow right if after one exercises the right to vote, the office of the candidate for which the majority voted is suddenly abolished and someone else assumes the duties of the

3

person who was elected.[1]  Other than impeachment pursuant to La. Const. art. X, § 24(A), the legislative and executive branches have no power—constitutional, statutory, or otherwise—to circumvent a constitutionally guaranteed right of the people to vote by removing an individual from an office earned through a popular vote, simply on the whims of certain state government officials.

Historically and customarily, when other positions have been legislatively abolished pursuant to the authority of La. Const. art. V § 32, the elected official has served out the term of the office to which the individual was elected.  In 2006, the two separate offices of the Criminal Sheriff and Civil Sheriff of Orleans Parish were consolidated by Louisiana Senate Bill No. 645 of the Thirty-Second Regular Session.  The statute enacted at the time was La. R.S. 33:1500,[2] which stated, in pertinent part:

> A. There shall be one sheriff for the parish of Orleans, who shall be elected by the qualified electors of the parish of Orleans. He shall be elected at the election for parochial and municipal officers in Orleans Parish, shall serve for a term of four years, and shall take office and begin his term on the first Monday in May following his election.
>
> B. When the sheriff provided for in Subsection A of this Section takes office, the separate offices of the civil sheriff and the criminal sheriff for the parish of Orleans shall be abolished, and the sheriff shall be the successor to and exercise all of the functions, duties, and responsibilities of their respective offices, which shall be merged and consolidated within the office of the sheriff for the parish of Orleans.

Section 23(A) of the bill contained a provision stating, "[f]or purposes of qualifying and election to the office of sheriff at the election of parochial and

---

[1]  There are other provisions available to remove an elected official from office while doing no harm to the people's right to vote and have their votes counted.  Should the Legislature feel strongly enough about removing an official from office, Article X, § 24(A) of the Louisiana Constitution establishes that "[a] state or district official, whether elected or appointed, shall be liable to impeachment … during his term of office of a felony or for malfeasance or gross misconduct while in such office."  Calvin Duncan was recently elected to the position of Orleans Parish Clerk of Criminal District Court, after receiving 68 percent of the popular vote in a runoff election.  Because of the enactment of Act 15, Mr. Duncan has not been afforded the opportunity to assume his office and therefore impeachment is not applicable.

[2]  This statute was redesignated as La. R.S. 33:5581 by 2011 La. Acts 248, § 3.  See La. Sess. Law Serv. Act 248 (H.B. 98).

4

municipal officers in the parish of Orleans to be held in 2010, the provisions of R.S. 33:1500(A) as enacted by Section 4 of this Act shall become effective upon signature by the Governor."

The above statute and section made clear the legislative intent for the criminal and civil sheriffs serving at the time to serve their full terms. At the end of those terms the offices would be abolished, a new office of Orleans Parish Sheriff would be established, and an election for that office would be held. Thus, the procedure did not run afoul of any constitutional provisions regarding the right to vote.[3] While the Legislature's intent to reduce costs to the public and improve the efficiency of the Orleans Parish judicial system is laudable, the method by which the Legislature has chosen to do so is unconstitutional.

When a constitutional challenge is made, the question is whether the constitution limits the Legislature, either expressly or impliedly, from enacting the statute at issue. When a statute conflicts with a constitutional provision, the statute must fall. **Caddo-Shreveport Sales and Use Tax Com'n v. Office of Motor Vehicles, Dept. of Public Safety and Corrections**, 97-2233, p. 6 (La. 4/14/98), 710 So.2d 776, 779. It is not enough to show that the statutes' constitutionality is fairly debatable; it must be shown clearly and convincingly that it was the constitutional aim to deny the Legislature the power to enact the statute. **Hite v. Larpenter**, 04-1821, p. 7 (La. App. 1 Cir. 9/23/05), 923 So.2d 140, 145, <u>writ denied</u>, 05-2255 (La. 3/10/06), 925 So.2d 511.

When deciding whether a particular legislative enactment is unconstitutional, this court has stated that it is not the court's duty to determine the wisdom behind

---

[3] Similarly, in 2016, Louisiana House Bill No. 600 of the Forty-Second Regular Session consolidated the Municipal and Traffic Courts of New Orleans without the need of an election or any removals from office. Made effective on January 1, 2017, the Municipal Court judges transferred on staggered dates to the new Municipal and Traffic Courts of New Orleans, and the judgeships of the Traffic Court were abolished upon those judges completing their terms. La. R.S. 13:2492.

the enactment of the legislation. **M.J. Farms, Ltd. v. Exxon Mobil Corp.**, 07-2371, p. 26 (La. 7/1/08), 998 So.2d 16, 34. It is well settled that statutes are presumed constitutional unless fundamental rights, privileges, and immunities are involved. **Caddo-Shreveport Sales**, 97-2233 at 5, 710 So.2d at 779.

Since the foundational and fundamental right to vote is involved in the present case, the constitutionality of Act 15 cannot be presumed. See **Caddo-Shreveport Sales**, 97-2233 at 5, 710 So.2d at 779. Laws restricting fundamental rights, such as the right to vote, are subject to strict scrutiny because such rights are considered to be essential to the structure of our society, in which citizens enjoy "ordered liberty." **State v. Webb**, 13-1681 (La. 5/7/14), 144 So.3d 971, 978; see also **Sudwischer v. Estate of Hoffpauir**, 589 So.2d 474, 478 (La. 1991) (Dennis, J., dissenting). Vested rights merit heightened scrutiny under the constitution and, as a result, any interference with vested rights is *per se* arbitrary and unreasonable and, thus, constitutionally prohibited. **Bienvenu v. Defendant 1**, 23-01194, p. 7 (La. 6/12/24), 386 So.3d 280, 288.

"Under strict scrutiny the government bears the burden of proving the constitutionality of the regulation by showing (1) that the regulation serves a compelling governmental interest, and (2) that the regulation is narrowly tailored to serve that compelling interest." **In re Warner**, 05-1303, p. 37 (La. 4/17/09), 21 So.3d 218, 246. The least restrictive means to achieve the compelling state interest must be followed. **State v. Spell**, 21-00876, p. 15 (La. 5/13/22), 339 So.3d 1125, 1137. Act 15 arguably passes the first element of the strict scrutiny test because the reorganization of the Orleans Parish judicial system is a compelling governmental interest that has been ongoing since Hurricane Katrina, after which the population of Orleans Parish dropped drastically and arguably the need for a bifurcated justice system diminished and could no longer be justified. However, the manner by which Act 15 is being *implemented* does not narrowly serve that interest, since it would

6

deprive the voters of the validity of their votes to elect an individual who prevailed in the election.

When a constitutional provision is clear and unambiguous, and its application does not lead to absurd consequences, it must be interpreted as written without further interpretation in search of its intent. See La. C.C. art. 9. The people's right to vote is not explicitly provided for in the U.S. Constitution or the Bill of Rights, but it is enshrined in the Constitution of the State of Louisiana, which explicitly guarantees the right to vote in Article I, § 10(A):

> Every citizen of the state, upon reaching eighteen years of age, shall have the right to register and vote, except that this right may be suspended while a person is interdicted and judicially declared mentally incompetent or is under an order of imprisonment for conviction of a felony.

Article I, § 10(A) was included in the Constitution, adopted by the Louisiana Constitutional Convention on September 8, 1973, ratified by the people of Louisiana in an election held on April 20, 1974, and became effective on January 1, 1975. It changed the voting rights conferred by the 1921 Constitution in many respects, but most importantly it is clear from the constitutional provision that "[e]very citizen of the state, upon reaching eighteen years of age, *shall* have the right to register and vote." Under well-established rules of interpretation, the word "shall" excludes the possibility of being "optional" or even subject to "discretion," but instead "shall" means "imperative, of similar effect and import with the word 'must.'" **Louisiana Federation of Teachers v. State**, 2013-0120, p. 26 (La. 5/7/13), 118 So.3d 1033, 1051.

There was debate at the Constitutional Convention over whether the two Orleans Parish clerk's offices would be consolidated at that time.[4] As a compromise, the normal referendum procedure to amend a constitutional provision was set aside,

---

[4] See Records of the Louisiana Constitutional Convention of 1973, Transcript Records, volume VI, pp. 952-58.

7

and the Legislature was given the unique authority to change the dual clerk system in Orleans Parish through the ratification of La. Const. art. V, § 32, which states:

> Except for provisions relating to terms of office as provided elsewhere in this Article, and notwithstanding any other contrary provision of this constitution, the following courts and officers in Orleans Parish are continued, subject to change by law; the civil and criminal district courts; the city, municipal, traffic, and juvenile courts; the clerks of the civil and criminal district courts; the civil and criminal sheriffs; the constables and the clerks of the first and second city courts; the register of conveyances; and the recorder of mortgages.[5]

By the plain language of the above constitutional provision, the Legislature can undeniably eliminate the office of clerk of court for the Criminal District Court of Orleans Parish; however, reading the phrase "notwithstanding any other contrary provision of this constitution" *in pari materia* with Article I, § 10(A) and other constitutional provisions does not lead to the conclusion reached by the majority. The plenary power given to the Legislature by Article V, § 32 cannot be implemented if it would nullify an election. As the right to vote is constitutionally established, it is fundamental in our system of self-governance and cannot be legislatively abridged. The enactment of Act 15 does not merely terminate a position; it effectively cancels the right to vote and voids an election in which the citizens participated and justifiably believed their votes were counted and would be given effect.

I agree with the majority that it is "not [the judiciary's] place under the Louisiana Constitution tripartite system to question the wisdom of the Legislature in adopting [Act 15]." See **Crockett v. State of Louisiana**, 26-00594, slip op. at 8 (La. 2026). However, "it is emphatically the province and duty" of this court "to say

---

[5] It cannot be ignored that La. Const. art. V, § 32 has existed for over fifty years without any legislative act to abolish, merge, or change the Orleans dual-clerk system in any way, until immediately after Mr. Duncan, who was duly released from prison following a murder conviction after having served twenty-eight and a half years, was elected to the office of clerk of the Orleans Parish Criminal District Court on November 15, 2025 with 68 percent of the votes. He had always proclaimed his innocence, and, after his release, he earned a law degree from Loyola University. The state officer who now defends this Act expressed opposition to Mr. Duncan before he was elected. **New York Times**, May 1, 2026, https://nytimes.com.

what the law is"[6] by balancing the scales of justice to ensure all provisions of the constitution are applied and the statutes enacted by the Legislature do not violate the constitution.

The provisions of La. Const. art. V, § 32 do not include temporal considerations as to when the position can be abolished. Clearly, the position of clerk of Orleans Parish Criminal District Court can be abolished prospectively. However, in reading the right to vote of La. Const. art. I, § 10(A) *in pari materia* with Article V, § 32 it becomes abundantly clear that these constitutional provisions can be reconciled, an absurd result can be avoided, and both provisions can be given meaning without trampling on the right to vote and elect an officeholder.

Louisiana Const. art. V, § 32 indicates that "the clerks of the civil and criminal district courts" "are continued." Continued means "lasting or extending without interruption" (https://www.merriam-webster.com/dictionary/continued); "still happening, existing" (https://dictionary.cambridge.org (follow "dictionary," then follow "continued")); "ongoing" (https://www.dictionary.com (follow "browse," then follow "continued")); "something that has staying power" (https://www.vocabulary.com (follow "dictionary," then follow "continued")); "lasting or enduring without interruption" (https://www.collinsdictionary.com (follow "dictionary," then follow "continued")). The phrase "subject to change by law" obviously means the Legislature can abolish the position, but only prospectively at the conclusion of the term, not hastily and immediately after voters elected a particular person to the position.

Article V, § 32 of the Louisiana Constitution also contains a phrase referencing "not withstanding any other *contrary provision* of this constitution." (Emphasis

---

[6] See **Marbury v. Madison**, 5 U.S. 137, 177 (1803). The constitution is the supreme law of our state and the bedrock of constitutional law is judicial review.

added.)  In my view, the only "contrary provision" is the constitutional provision that establishes the "clerks of the civil and criminal district courts."  The drafters of the constitution did not want an argument to be made that constitutionally established positions could not be eliminated by a statutory enactment but intended that such positions could be "subject to change by law," effectively utilizing a "belt and suspenders" approach to abolishing a position.

The right to vote enshrined in Article I, § 10(A) is not a "*contrary provision,*" but rather a co-extensive and complimentary provision to Article V, § 32 of the constitution.  The voters chose the clerk of court in a local election,[7] and that right to choose who serves remains protected in the constitution.  It would be illogical and a violation of the right to vote afforded the citizens if the Legislature could pass a law *after* the right to vote was exercised to strip the voters of their choice of office holder and declare someone else the officeholder.  The simple solution to avoid absurdity and balance the constitutional rights at issue is to read the constitutional

---

[7] The majority briefly addresses the applicability of La. Const. art III, § 13, which states that "no local or special law shall be enacted unless notice of the intent to introduce a bill to enact such a law has been published on two separate days, without cost to the state, in the official journal of the locality where the matter to be affected is situated."  Intervenors raised the issue of Act 15 being unconstitutional due to a lack of publication in the local newspapers of Orleans Parish.  Although I need not address this issue to any great extent because I find Act 15 unconstitutional for another reason, the argument posed may have some efficacy.  As support, the majority cites **City of New Orleans v. Treen**, 431 So.2d 390, 395 (La. 1983), to assert when the constitution grants the power to adopt a particular piece of legislation, there is no publication requirement, regardless of whether the legislation is locally or specially targeted.  In **Treen**, the law in question, La. Const. art. IX, § 1, was deemed as expressing "a broad public policy," and this court did not find that the power that the law granted to the Legislature was "sufficiently specific" to require compliance with La. Const. art. III, § 13.

Article V, § 32 specifically addresses the clerks of court for Orleans Parish, as well as other offices located in the Parish of Orleans.  The article was included at the 1973 Constitutional Convention for the very narrow purpose of addressing the bifurcated judicial system of one parish, and the article is not written to apply to any other parish in the state.  In contrast, Article IX, § 1 encompasses "[t]he natural resources of the state," and does not explicitly focus on any one parish or municipality.  This court was correct in **Treen** to find the publication requirement inapplicable in that case.  However, "when the operation of a law is limited to certain parishes, it is suspect as a local or special law."  **State v. Labauve**, 359 So.2d 181, 183 (La. 1978).  In the present case, Act 15 impacts the Orleans Parish court system only.  I express no opinion on the final outcome of this issue.

provision as it is written. If a determination is then made that the position can be abolished, it may only be abolished *after* the elected officer completes the term of office to which he or she was elected to give full effect to the vote of citizens.

Thus, in order to avoid the disenfranchisement of the Orleans Parish voting populace, there is only one solution: the office must be eliminated prospectively, at the temporal line of demarcation when the elected official has served out the term of office to which the individual was elected.[8] To avoid constitutional infirmity, the office can only be abolished effective at the end of the term, not before the term began or during the term.

Further, unlike the majority, I find that Act 15 creates the new office of Orleans Parish Clerk of Court.[9] Act 15, beginning as S.B. No. 256, amended numerous statutes by removing all references to the offices of Orleans Clerk of Criminal District Court and Orleans Clerk of Civil District Court, so that the statutes refer only to the office of Orleans Parish Clerk of Court. In other words, the offices of criminal clerk and civil clerk were terminated. Despite the merger of these two offices into one new office, Orleans Criminal District Court and Orleans Civil District Court remain distinct judicial districts. Whereas each judicial district had been served by its own respective clerk, now one clerk will serve two separate judicial districts.

---

[8] Justice Griffin points out that this is what was suggested in **Tully v. Edgar**, 171 Ill.2d 297 (Ill. 1996). In that case, the Illinois Supreme Court used a strict scrutiny test in determining whether a legislative act curtailing the term of an existing elected office, effectively removing a sitting trustee of a state university from office, was unconstitutional. The court found the portion of the act that removed the person from office invalid. The court suggested, "[t]he Legislature could certainly provide that, upon the expiration of the terms of office of the currently elected trustees, successor trustees will be appointed rather than elected." *Id.*, at 312.

[9] The federal district court also reached the same conclusion that a new office was established in **Duncan v. Landry**, 26-CV-00460 (M.D. La. 5/3/26), where the federal district court enjoined the Governor and Secretary of State from issuing a commission to Ms. Napoleon to serve as Orleans Parish Clerk of Court. The U.S. Fifth Circuit Court of Appeals later stayed that injunction but did not reverse the finding of the district court. **In re Landry et al.**, No. 26-30249 (U.S. 5th Cir. 5/4/26).

In addition, Section 4 of Act 15 explicitly states that the former clerk of Criminal District Court would complete his term, and then the office would be abolished on May 3, 2026, "before the term of any other criminal clerk of court begins." On that date, the duties of the clerk of Orleans Parish Criminal District Court, including all essential documents, records, and other property of the abolished office were transferred to the clerk of the Orleans Civil District Court. Section 5 of Act 15 renames the clerk of Orleans Civil District Court to the "clerk of court for the parish of Orleans." Thus, the Act consolidated the duties of the clerk of Criminal District Court with the Clerk of Civil District Court, abolishing those two offices to create the new office of Orleans Parish Clerk of Court.[10]

The former clerk of Orleans Parish Civil District Court, Chelsey Napoleon, is now serving as the Orleans Parish Clerk of Court—an office to which she was not elected. An election must be for a specific office with a specific term and specific powers. **Calogero v. State ex rel. Treen**, 445 So.2d 736, 738 (La. 1984). The implementation of Act 15 essentially named Ms. Napoleon as the new clerk of court, even though no election has yet been held for that office.[11] By handing over the

---

[10] Sections 4 and 5 of Act 15 state:

> Section 4. The provisions of this Act shall not reduce the current term of office of the clerk of criminal district court for the parish of Orleans on the effective date of this Act. The office of clerk of criminal district court for the parish of Orleans shall be abolished at the end of May 3, 2026, and before the term of any other criminal clerk of court begins. Immediately thereafter, the authority, functions, duties, and responsibilities of the office of clerk of criminal district court for the parish of Orleans, and all of the books, papers, records, monies, actions, and other property of every kind and description, movable and immovable, real and personal, possessed, controlled, or used by the office of the clerk of criminal district court for the parish of Orleans shall be transferred and owned, possessed, controlled, and used by the clerk of the civil district court for the parish of Orleans, who shall thereafter be referred to as the clerk of court for the parish of Orleans.

> Section 5. Whenever the clerk of the criminal district court for the parish of Orleans is referred to or designated by law, rule, or regulation on and after the date that office is abolished, such reference or designation shall be deemed to apply to the clerk of civil district court for the parish of Orleans or hereafter "clerk of court for the parish of Orleans".

[11] Article V, § 28 of the Louisiana Constitution states: "In each parish a clerk of the district court *shall* be elected for a term of four years." (Emphasis added.) At the floor hearing on Act 15, Ms.

duties of the office of clerk of Orleans Parish Criminal District Court to the former clerk of Orleans Parish Civil District Court, the Legislature effectively chose Ms. Napoleon to be the first Orleans Parish Clerk of Court. The Legislature could have written Act 15 to do the opposite: handing the duties of clerk of Orleans Parish Civil District Court to Mr. Duncan and naming him the New Orleans Parish Clerk of Court. This, of course, would have been just as unconstitutional as the manner in which Act 15 was actually implemented, since choosing either one over the other would potentially create Equal Protection issues.[12]

In response to the legislative action, the Orleans City Council created an interim position of Clerk of court until a special election could be held. Since the City Council did not reinstate Mr. Duncan, they appointed an interim clerk—an individual who had the understanding that he would not serve a full term—who could be replaced once an election was held and the people of Orleans Parish had democratically chosen their own Clerk of Court. The current unfortunate situation should not exist in our democratic society—three individuals claiming the same office—a situation precipitated by the Legislature's impulsive enactment of Act 15, the Governor's signing the Act into law, and the Attorney General's enforcement of the same.[13]

---

Napoleon was asked: "No one voted for you to be the clerk of court for Orleans Parish?" Ms. Napoleon responded: "Correct." May 18, 2026, Hearing Transcript at 38:19-21.

[12] At the Senate hearing on Act 15, Sen. Jay Morris, the bill's sponsor was asked: "Why did you choose [to consolidate under] the Civil District Court Clerk as opposed to the Criminal District Court Clerk?" Sen. Morris replied: "Well, the Criminal District Court Clerk was going out and Ms. Napoleon has been there a long time …." 2026 Leg., Reg. Session at 1:26:10 (La. 4/8/26). At the same hearing, Rep. Terry Landry asked: "Is there a vacancy right now for the criminal clerk?" Rep. Dixon McMakin replied: "The incumbent will not be in the seat, yes, sir." Sen. Morris, who authored the amendment to Act 15 to include Sections 4 and 5, explained that the purpose of that amendment was to [t]ry to go ahead and get it done before Mr. Duncan takes office." *Id.* at 1:47:51.

[13] There appears to have been very little, if any, planning on the part of the Legislature to make this transition. At the legislative hearing to enact Act 15, Ms. Napoleon herself admitted: "I would say that the process [of consolidating the two offices by the Legislature] did not allow for a planning period." May 18, 2026, Hearing Transcript at 53:8-14.

Far too much political posturing has already occurred as a result of the enactment of Act 15. Three individuals laid claim to the same office. The New Orleans City Council, District Attorney, and Mayor then felt compelled to appoint an interim clerk to fill what they deemed was a vacant position. Those city officials were threatened with prosecution under the Usurper Statutes if they did not cease and desist.[14] Although more political posturing may follow if this unconstitutional implementation of Act 15 is continued, this court must maintain its focus on the law and the facts immediately before it without consideration of partisanship, politics, or personality.

This court reluctantly and temporarily resolved the problem, based on the presumption that a law is constitutional until found unconstitutional by this court, and Ms. Napoleon is currently serving as the Clerk of Court for Orleans Parish. Ensuring that the civil and criminal courts of Orleans Parish could operate effectively and efficiently became this court's priority. I understand and applaud the majority's haste to resolve this matter, but it would have been more appropriate to order this matter to be discussed in open court. The way this court has proceeded diminishes the transparency provided by civil discourse between the Justices, the parties, and their counsel, in a forum where the public can view the proceedings. By foregoing the request for oral argument, the public has been prevented from viewing the dedication and effort the Justices have individually and collectively put into resolving the challenging issues of this case.

## CONCLUSION

A "government of the people, by the people, for the people" does not exist if the Legislature enacts and the Governor signs an Act that deprives citizens of the ability to elect a candidate of their choosing. The right to vote deserves protection.

---

[14] See La. R.S. 42:71-72.

Following the casting of a ballot, allowing the person elected by the people to assume office must be equally protected for the vote of the citizens to be effective. Denying the effect of the vote disenfranchises the person who cast the vote by stripping the vote of any meaning. I find the timing of the implementation of Act 15 is not only unfortunate but also unconstitutional. The implementation of Act 15 before the office holder can serve the term as elected is inimical and deleterious to the federal and state Constitutions, the electoral process, and the right to vote. For these reasons, I respectfully dissent.

# SUPREME COURT OF LOUISIANA

## No. 2026-CD-00594

### GARY CROCKETT

### VS.

### STATE OF LOUISIANA; JEFF LANDRY, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF LOUISIANA, ET AL.

### C/W

### CHELSEY RICHARD NAPOLEON, IN HER OFFICIAL CAPACITY AS CLERK OF COURT FOR ORLEANS PARISH

### VS.

### CITY OF NEW ORLEANS; JEAN PAUL "J.P." MORRELL IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE NEW ORLEANS CITY COUNCIL; HELENA MORENO IN HER CAPACITY AS THE MAYOR OF THE CITY OF NEW ORLEANS & CALVIN JOHNSON, IN HIS CAPACITY AS CITY APPOINTED INTERIM CLERK OF COURT FOR ORLEANS PARISH

**On Supervisory Writ to the 19th Judicial District Court,
Parish of East Baton Rouge**

**Hughes, J. additionally concurring.**

I agree with the entirety of the Per Curiam but write separately to highlight the right referenced at footnote 2. La. Const. Art. X, § 23 provides that "[t]he compensation of an elected public official shall not be reduced during the term for which he is elected."

We did not reach any question concerning the scope of that provision here. Any claim for monetary compensation by Calvin Duncan related to foregone compensation would therefore be able to be resolved in future litigation.

No. 2026-CD-00594

GARY CROCKETT

VS.

STATE OF LOUISIANA; JEFF LANDRY, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF LOUISIANA, ET AL.

C/W

CHELSEY RICHARD NAPOLEON, IN HER OFFICIAL CAPACITY AS CLERK OF COURT FOR ORLEANS PARISH

VS.

CITY OF NEW ORLEANS; JEAN PAUL "J.P." MORRELL IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE NEW ORLEANS CITY COUNCIL; HELENA MORENO IN HER CAPACITY AS THE MAYOR OF THE CITY OF NEW ORLEANS & CALVIN JOHNSON, IN HIS CAPACITY AS CITY APPOINTED INTERIM CLERK OF COURT FOR ORLEANS PAIRSH

*On Supervisory Writ to the 19th Judicial District Court, Parish of East Baton Rouge*

**GRIFFIN, J., dissents and assigns reasons.**

The majority allows the legislature to nullify the results of any election it disagrees with, splits from another State Supreme Court decision, and effectively invites review by the United States Supreme Court. I find it is incumbent on this Court to reaffirm the right of all voters – be they in Orleans, Union, East Baton Rouge, or St. Tammany Parishes – to have their votes meaningfully counted. Because the majority fails to safeguard this fundamental right, I respectfully dissent.

The United States Constitution recognizes that the fundamental right to vote cannot be diluted or denied and that all qualified voters have the right "to have their votes counted." *Reynolds v. Sims*, 377 U.S. 533, 554-55 (1964). The Louisiana Constitution similarly recognizes "[e]very person who is both a citizen of the state and of the United States, upon reaching eighteen years of age, shall have the right to register and vote…" La. Const. art. I § 10. This right is likewise fundamental, and

1

all citizens have the right "to have their votes counted." *Adkins v. Huckabay*, 99-3605, 7 (La. 2/25/00), 755 So. 2d 206, 211. Both the federal and state constitutional guarantees must include a prohibition against the legislature abolishing an office after votes have been cast and before the term for which those votes were cast has concluded. Otherwise, the right to vote is not only diluted but is completely nullified. As recognized by the Illinois Supreme Court when it applied strict scrutiny and struck down a nearly identical law under the Illinois Constitution (which is similar in scope to both the United States and Louisiana Constitutions):

> The legislation challenged here basically eviscerates the election process by providing that, even though the trustees received the majority of votes cast and counted on election day, they are prohibited from holding office for the terms to which they were elected…

> The legislation challenged here does not simply give the votes cast by some citizens less effect than others. Rather, it establishes a mechanism for total disregard of all votes cast by citizens in a particular election. The vote cast by a citizen is not simply diluted, but is totally nullified by the legislative scheme. The Act does not simply "impair" the vote but, rather, obliterates its effect. The Act, in essence, voids the votes cast by citizens in a valid election and authorizes the Governor to select the candidates of his choice. The integrity of the vote is undermined and destroyed by the legislative scheme.

> It distorts reality to argue, as the appellants here do, that the right to vote is satisfied whenever a citizen is permitted to cast his vote and have that vote counted. The democratic form of government guaranteed by our constitution requires something more than an adherence to form. It is not merely the casting of the vote or its mechanical counting that is protected by our constitution. It is the effect given to the vote—namely, the office—that is protected.

> We must vigilantly ensure that our constitution protects not just the right to cast a vote, but the right to have a vote fully serve its purpose. If the vote cast by all those who favor a particular candidate exceeds the number cast in favor of a rival, the result is constitutionally protected from nullification except by the voters themselves. When the people have chosen their representatives in a valid election, legislation that nullifies the people's choice by eliminating the right of the elected official to serve implicates the fundamental right to vote.

2

*Tully v. Edgar*, 171 Ill. 2d 297, 306-309 (1996). However, the *Tully* court conceded, as I do here, the legislature has constitutional authority to abolish an elected office at the end of the term. *Id*. at 312.[1]

The State's reliance on La. Const. art. V § 32 to negate the right to vote is misplaced. The "notwithstanding" language from this provision cannot allow the legislature to ignore all other parts of the Louisiana Constitution. Otherwise, the State could ignore those provisions regulating how legislation is passed. Section 32 simply means that despite other offices created by the Louisiana Constitution, certain offices in Orleans Parish were continued, unless changed by duly enacted legislation. *Cf State v. Francois*, 445 So. 2d 416, 418 (La. 1983). A law that violates the state or federal constitutions is not duly enacted.[2] Further, nothing in the Louisiana Constitution can authorize the State to ignore the rights found in the United States Constitution.

Lastly, I find merit in the federal constitutional issues raised in this matter, especially given that a fundamental right has been burdened, individuals in Orleans Parish had their ballots effectively ignored while others did not, and the potential animus present in this legislation. *See Romer v. Evans*, 517 U.S. 620, 632 (1996) and *City of Cleburne, Tex. v. Cleburne Living Ctr*., 473 U.S. 432 (1985).

---

[1] Impeachment of officials and removal by discipline of judges do not violate the Louisiana or federal constitutional right to vote because they are expressly provided for or would likely meet strict scrutiny.

[2] The constitutional convention records also indicate that Section 32 does not abrogate the rest of the Louisiana Constitution. The framers – while recognizing that majority vote of the legislature can combine district courts and that a referendum is not required to combine Orleans' clerks or other offices – specifically acknowledged that the Orleans Parish civil and criminal courts were separate districts and required a referendum to be altered. Records of the Louisiana Constitutional Convention of 1973, Transcript Records, volume VI, page 958, August 24, 1973, 36th Day of the Proceeding. The framers also rejected a proposal that would have exempted Orleans Parish from the requirements of La. Const. art. V § 15 and immediately rejected an attempt to remove the referendum requirement from the same section. Records of the Louisiana Constitutional Convention of 1973, Transcript Records, volume VI, page 786 – 792.

That Section 32 comes after the Declaration of Rights of Article I does not allow it to negate Article I, as all government power comes after Article I and is often more specifically listed.

GARY CROCKETT

VS.

STATE OF LOUISIANA; JEFF LANDRY, IN HIS OFFICIAL CAPACITY
AS GOVERNOR OF THE STATE OF LOUISIANA, ET AL.

C/W

CHELSEY RICHARD NAPOLEON, IN HER OFFICIAL CAPACITY AS
CLERK OF COURT FOR ORLEANS PARISH

VS.

CITY OF NEW ORLEANS; JEAN PAUL "J.P." MORRELL IN HIS
OFFICIAL CAPACITY AS PRESIDENT OF THE NEW ORLEANS CITY
COUNCIL; HELENA MORENO IN HER CAPACITY AS THE MAYOR OF
THE CITY OF NEW ORLEANS & CALVIN JOHNSON, IN HIS
CAPACITY AS CITY APPOINTED INTERIM CLERK OF COURT FOR
ORLEANS PAIRSH

On Supervisory Writ to the 19th Judicial District Court, Parish of East Baton
Rouge

**GUIDRY, J., dissents and assigns reasons.**

The per curiam in this matter amounts to nothing less than condoning a brazen

and unconstitutional political coup that subverted the will of the majority of the

electorate of Orleans Parish by unceremoniously ousting Calvin Duncan from his

duly elected position as Clerk of the Orleans Criminal District Court. By nullifying

the majority vote that elected Mr. Duncan, the legislature in essence disregarded and

disparaged the right of the people of New Orleans to vote for the person of their

choice to hold an elected office in that city. See La. Const. art. I, § 24 ("The

enumeration in this constitution of certain rights shall not deny or disparage other

rights retained by the individual citizens of the state."). Act 15 is an unconstitutional

and unconscionable action and a thinly veiled and targeted attempt by government

actors to usurp and overturn the will of the electorate because they do not agree with the voters' choice.  As we commemorate the 250th anniversary of our nation, dare we forget that we are a government of the people, for the people, and by the people. We have enshrined that principle in our own state constitution.   As stated in La. Const. art. I, § 1 of the Louisiana Constitution:

> All government, of right, originates with the people, is founded on their will alone, and is instituted to protect the rights of the individual and for the good of the whole. Its only legitimate ends are to secure justice for all, preserve peace, protect the rights, and promote the happiness and general welfare of the people. The rights enumerated in this Article are inalienable by the state and shall be preserved inviolate by the state.

In our democracy, government exists for the benefit of and is subservient to the people and not the other way around. What was done in this instance is not only unconstitutional but undemocratic and downright un-American.  The end result is that Act 15 disenfranchises an overwhelming majority of voters in New Orleans and eviscerates the decision they made on election day. Citizens go through increasingly burdensome efforts to register and vote; in many cases, they stand in long lines to cast their votes expecting that the candidate of their choice receiving the requisite votes will actually get to serve. Otherwise, their efforts to fully participate in our democracy through the electoral progress is rendered a vain and useless effort.

The whole scheme behind Act 15 is pretextual in nature.  The records of the legislative proceedings and the sparse record developed in haste in this case leaves no doubt that the State cannot meet its burden of showing a compelling state interest when, as here, they seek to affect the fundamental right to vote.  This was not about operational efficiency, reduced costs, continuity of services, etc., because no one bothered to compile any data, to do any studies, to consult with any justice partners, or the elected representatives of the people of New Orleans who were impacted by this measure, before embarking on this course of action.  This makes Act 15 even more repugnant to our system of democracy.  Act 15 offends traditional notions of

2

substantial justice and fair play. This court should have repudiated this frontal assault on our democracy by properly declaring Act 15 unconstitutional.

As for the actions of this court, the per curiam opinion is just plain wrong on the merits in so many ways.

First, Act 15, as a local or special law, is invalid because notice of the intention to introduce the act was not published as required by La. Const. art. III, § 13. This act significantly impacts *only* the citizens of New Orleans. This important safeguard of requiring notice was placed in the constitution to guard against the very abuse of legislative power that took place in the enactment of Act 15. The per curiam, in footnote one, makes a blanket statement about an extensive history supporting the position that Article V, § 32 is not a local law, but fails to cite any jurisprudence from this court or any other court that supports that statement. Therefore, since notice of the intention to introduce the act was not published as required by La. Const. art. III, § 13, Act 15 is unconstitutional. The per curiam errs by not so holding. See City of New Orleans v. Treen, 431 So. 2d 390, 395 (La. 1983).

Act 15 is also unconstitutional based on La. Const. art. I, §10 and related clauses. The per curiam correctly recognizes that the right to vote is sacrosanct and enshrined in our state constitution. Yet the per curiam fails to vindicate that right. Even if it is conceded that the legislature could by statute abolish the office of the clerk of criminal court, surely that would have to be done prospectively when, as here, the electorate has elected the person of their choice to assume a then existing office. The constitution provides the method for filling clerk's offices, which is by election. La. Const. art. V, § 28; see also Fremin v. Boyd Racing, LLC, 24-00995, p. 4 (La. 3/21/25), 403 So. 3d 546, 551 ("where the legislative power is restricted, that power is reserved to the people."). When the legislature created a new consolidated clerk's office, it was not free to appoint a person to that position. Russell v. McKeithen, 257 La. 225, 244, 242 So.2d 229, 236 (1970) ("Where the

3

Constitution has provided the method of filling offices, the Legislature may not provide for filling them in any other manner."). Act 15 itself states that there shall be one clerk for the parish of Orleans, who shall be elected by the qualified electors of Orleans Parish. Yet the per curiam sanctions the appointment/selection of a person to hold the newly created position of Clerk of Orleans Parish without requiring that person to stand for election, despite the statute's own language that requires the clerk to be elected, consistent with the constitution. In fact, the per curiam's decree to enjoin the officials in New Orleans from ensuring an election is held is not supported by the constitution or the language in the statute. The legislature states the position requires an election, then appoints/selects someone to fill the position. This is internally inconsistent, and this court should have exercised its constitutional duty to so declare.

Timing is everything. That is why all prior consolidations of offices in Orleans Parish have occurred prior to elections. That is why even the language of La. Const. art V, § 32, on which the per curiam hangs, begins with the words "[e]xcept for provisions related to terms of office as provided elsewhere in this article." The per curiam just glosses over this limitation by concluding that the timing is perhaps unfortunate. No, the timing here is dispositive. Mr. Duncan was duly elected and took his office during a period in which the federal district court had issued an injunction against the implementation of Act 15. The per curiam itself, in a footnote, cites La Const. art. X, § 23 that provides the compensation of an elected official shall not be reduced during the term for which he is elected. A concurring justice even posits that the question of whether Mr. Duncan is entitled to his salary remains undecided. Is the per curiam suggesting that Mr. Duncan cannot perform the duties of his office but is entitled to be paid his full compensation for the entirety of the term to which he was elected? That would seem to be an absurd result. If the majority believes Mr. Duncan may be entitled to his salary, that means they realize

4

he was duly elected and had commenced his term from which they should have concluded that abolishing his office during his term was unconstitutional.

In Tully v. Edgar, 171 Ill. 2d 297, 306-309, 664 N.E. 2d 43, 48-50 (1996), a similarly egregious and outrageous legislative attempt at voter nullification and disenfranchisement was struck down by the Illinois Supreme Court under their state constitution, which like ours, strongly protects the right to vote. The majority attempts to obfuscate this reality by citing the "notwithstanding any contrary provision" language of La. Const. art. V, § 32. The per curiam broadly interprets and expands the "notwithstanding" language to mean that the provision is not limited by any other provisions of the Louisiana Constitution. Notably, by doing so, the per curiam seemingly ignores the qualifying term of "contrary." The provisions of our constitution that render Act 15 unconstitutional are not contrary provisions but are, in fact, complimentary provisions that can and should be read *in pari materia* to give full effect to clearly reconcilable provisions. It is an absurdity to posit that the right to vote on who holds an office is contrary to a provision regarding the existence of that office. The legislature may decide whether the office exists, but the constitution says the people decide by election who holds elected office; namely, here, the right to vote.

Article V, § 32 solely addresses the offices of the clerks (and other positions); it does not address who occupies the offices. While clearly Section 32 of Article V allows the legislature to change the basic structure of the courts and officers listed therein, it does not and should not be interpreted as allowing the legislature unfettered discretion to violate the constitutional rights of citizens to elect persons of their choice to those offices. The authority granted to the legislature in La. Const. art. V, § 32 does not give the legislature license to exercise that authority in a manner that tramples on other constitutional provisions, rights, and protections.

5

While the State strenuously argues that a new office was not created as a result of the legislature combining the offices of the civil and criminal clerks, it cannot be denied that the office of criminal clerk was eliminated with all of the related authority and responsibilities of that office being transferred to and substantially consolidated with those of the civil clerk in a newly named office. Considering the added authority and responsibilities transferred, it should be recognized that the unified position of the clerk of court of the Orleans Parish District Court is a significant expansion of the duties and responsibilities required, as previously, the authority and responsibilities were held and exercised by two separate officeholders. This conclusion is supported by the fact that under analogous principles of Louisiana civil service law, the unified clerk office would be deemed a new position. See Hoppe v. City of Shreveport, 340 So. 2d 1314, 1319 (La.1976) (finding that the positions at issue in that case were "entirely new positions, with broadened responsibility and greater pay, than that which … they had been performing by virtue of their permanent appointment to a previously existing classification of the civil service system.").

The majority not only errs on the merits but procedurally, as well. It allows this matter to be decided behind the closed doors of the conference room rather than in the open *courtroom*. Oral argument, which was denied by the majority, would have provided fuller transparency and ensured full and open access to the courts by the public and the press. The courts ought to always be open to the citizens to whom they belong and for whose protection they exist, and the media should have full access to report on the fullness of our deliberative process. Not allowing for oral argument and a fully authored opinion compounds this court's error in how it assumed jurisdiction of this matter in the first place. This was done by taking the rare and unique approach of assuming jurisdiction without first allowing for a ruling by the trial judge, who was told to hold a hearing but prohibited from performing his

6

duty to rule on what he heard. What a travesty. Then this matter was not allowed to be reviewed and further developed at the intermediate appellate level. The totality of these deviations from our normal customs and practices risk undermining public confidence in the judiciary and did nothing to promote the orderly administration of justice.

In conclusion, the majority's per curiam today accommodated the political sword, which is Act 15, that cuts at the very heart of our democracy in denying the citizens of New Orleans the right to have the duly elected clerk of criminal court to serve for the term for which they elected him. Our constitutional role, unlike that of the political branches of our government, is not to blindly accommodate the sword, but instead is to be a shield to protect the rights of our citizens. The right to vote is among the most fundamental of the rights that we are charged to protect. I will not be complicit in the abdication of that constitutional role that our democratic system assigns to the judiciary. Therefore, I respectfully dissent.